IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TILO'E C. WILLIAMS,

                    Plaintiff,

          v.

CAROLYN W. COLVIN, Commissioner of
Social Security;

                    Defendant.

**8:16CV60**

**MEMORANDUM AND ORDER**

This matter is before the court on plaintiff Tilo'e C. Williams' appeal of an adverse decision by the Social Security Administration.  Filing No. 1 (Complaint).  This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") that plaintiff is not disabled.  The plaintiff appeals the Commissioner's decision to deny his application for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et. seq.* and 42 U.S.C. § 1381 *et seq.,* respectively. This court has jurisdiction under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  Upon review of the record, this court concludes that the decision of the Administrative Law Judge ("ALJ") denying benefits is not supported by substantial evidence.  Accordingly, the decision of the ALJ, and thereby the Commissioner, is reversed.

**I.    BACKGROUND**

On November 26, 2012, plaintiff protectively filed an application for supplemental security income.  Filing No. 12-1 at 14 (ALJ Hearing Decision).  The Commissioner initially denied plaintiff's claim on February 28, 2013, and again upon reconsideration on May 9, 2013.  Plaintiff filed a request for a hearing on June 3, 2013, which was held on

September 11, 2014.  *Id.*  The ALJ issued an unfavorable decision on November 4, 2014.  *Id.* at 11.  The Commissioner then denied plaintiff's request to review the ALJ's decision on December 22, 2015, thus making the ALJ's decision the final decision of the Commissioner.  *Id.* at 2 (Notice of Appeals Council Action).  Following the denial, plaintiff filed a complaint before this court.

Plaintiff, who grew up in Omaha, is thirty-six years old and currently married "but separated."  Filing No. 12-1 at 37 (Transcript of Oral Hearing).  He has four children, ranging in age from eight years old to seventeen years old.  *Id.*  His current wife is not the mother of any of his four children, and plaintiff claims to be "way behind" on child support for three of his children.  *Id.*  Plaintiff complains of headaches, back pain, and mental health problems.  Filing No. 12-5 at 60 (Questionnaire).  Plaintiff also complains of anxiety, bad mood, depression, sleep disturbance, and low libido.  Filing No. 12-6 at 112 (Progress Notes).  He claims that he "get[s] angry easily and react[s] aggressively," and does not like being around people.  Filing No. 12-5 at 60 (Questionnaire).  Plaintiff states that he is currently on Risperidone, Cialis, Mirtazapine, and Fluoxetine.  *Id.* at 57 (Medications).  As of October 14, 2013, he was diagnosed with major depression, single episode with psychotic features by his psychiatrist, Vithyalakshmi Selvaraj, M.D., who treated him from October 14, 2013 to December 16, 2013 and then again on May 14, 2014.  Filing No. 12-6 at 97-98 (Progress Notes).  Plaintiff has also been diagnosed with bipolar disorder, unspecified, by Thomas Guck, PhD, who treated him from March 26, 2014 to April 30, 2014.  *Id.* at 107 (Progress Notes).  His alleged onset date is November 26, 2012.  Filing No. 12-1 at 32 (Transcript of Oral Hearing).

2

Plaintiff "remembers being depressed as a kid," and being "physically abused by his mom . . . whenever she [got] high." *Id.* at 96. He reported that his mother, Beverly Williams, had a cocaine dependence. *Id.* at 97. Plaintiff states that his mother is now disabled and he "can't abandon her." *Id.* at 96. He claims to relive the experience of the abuse at the hands of his mother "on a daily basis," getting "flashbacks" every time he sees her. *Id.* Plaintiff dropped out of school in the ninth grade, and claims he cannot read or write anything more than his name. Filing No. 12-1 at 39 (Transcript of Oral Hearing); Filing No. 12-5 at 5 (Disability Report). He cannot read a newspaper or write even a brief note. Filing No. 12-1 at 63 (Transcript of Oral Hearing). Plaintiff's educational records are replete with disciplinary reports, ranging from instances of verbal aggression to physical confrontation. Filing No. 12-5 at 77, 81 (Education Records).

Plaintiff claims a "life altering event" happened to him when he was fourteen years old. Filing No. 12-1 at 62 (Transcript of Oral Hearing). He was in a severe car accident, leaving him with a brain injury. *Id.* He claims that after the accident, he did not attend school as much as he should have. *Id.* This is corroborated by a disciplinary report from October 7, 1993, which stated:

> "[Plaintiff] has a history of average IQ scores until [November 1992] when his full scale IQ was 69. [Plaintiff] was struck by a van and suffered a concussion. . . . His academic performance has markedly decreased over the last 2 yrs [sic]. He is extremely distractible and interacts with his environment in a physically confrontive [sic] manner."

Filing No. 12-5 at 81 (Education Records). The report went on to state that "[Plaintiff's] peers do not seek him out and avoid him as much as possible." On January 10, 1994, school officials decided to reduce the length of a normal school day to only half a day

3

for plaintiff, finding that plaintiff could not function a full day in a regular school setting. *Id.* at 78.  Transcripts from Omaha Public Schools show that plaintiff received failing grades in special education classes, even after all of the curriculum was "modified" and a "1:1 strategy [was] implemented."  *Id.* at 70-72, 89.

Plaintiff's educational history is summed up best by one disciplinary report in particular:

> "[Plaintiff] does not begin a task without teacher assistance.  If a teacher withdraws his attention, [plaintiff] will engage in many off-task behaviors. He is extremely distracted by his environment and oftentimes it appears that [plaintiff] misinterprets his surroundings.  He is very select with adult interaction and he appears to mistrust many authority figures.  He appears to cope with his environment via verbal and physical aggression and he does not accept confrontation."

*Id.* at 89.  One teacher even went so far as to report that "[Plaintiff] was the most frightening student I've dealt with . . . in-house because of his physically aggressive behavior."  *Id.* at 94.

After dropping out of school, plaintiff was in and out of prison.  Filing No. 12-1 at 39-40 (Transcript of Oral Hearing).  He reports serving time in prison on two different occasions.  *Id.* at 40.  Plaintiff first served time in state prison for "like a year and a half" for "controlled substance and fire arms" charges.[1]  *Id.*  Approximately two years after serving his first sentence, plaintiff reports being incarcerated in federal prison from 2005 to 2012 for a felon in possession of a firearm charge.[2]  *Id.* at 41.  Plaintiff claims he was

---

[1] The only known information about these charges is plaintiff's claim that he "pointed his gun at a drug dealer, who was giving drugs to his mother."  Filing No. 12-6 at 96 (Progress Notes).

[2] Plaintiff claims that at the time, he rented a house in his own name from his aunt's husband. Filing No. 12-1 at 41 (Transcript of Oral Hearing).  He claims there were weapons in the house while he was not there, but because the house was in his name, he was convicted through constructive possession.  *Id.*  Plaintiff states he "tried to fight it" but lost at trial.  *Id.*

sentenced to "100 and some months," but was released early to a halfway house for good behavior.  *Id.*  Plaintiff reports staying at the halfway house for "six months or so" and looking for employment while there.  *Id.*  He reported getting jobs through Staff Labor West, a temp agency.  *Id.* at 43.  After leaving the halfway house, plaintiff moved in with his mother.  *Id.* at 44.  Plaintiff reports this living arrangement only lasted about three months after he and his mother "kind of like bumped heads and [they] kind of went [their] separate ways."  *Id.*  He is currently living with his aunt.  *Id.* at 37.

After leaving the halfway house, plaintiff worked at Popeye's, a fast food restaurant, for "about two and a half months" as a kitchen cook.  *Id.* at 43; Filing No. 12-5 at 58 (Work Background).  Plaintiff claims to have also accepted a job at Deffenbaugh Industries, a trash collection service, at the same time he worked at Popeye's.  Filing No. 12-1 at 46 (Transcript of Oral Hearing).  Plaintiff does not say why he left Popeye's, but he does note that working two jobs at the same time took a toll on him.  *Id.*  He reported working at Deffenbaugh's for six to eight months.  *Id.*  After leaving Deffenbaugh because of the weather, plaintiff states he found employment at Greater Omaha Packing.  *Id.* at 47; Filing No. 12-5 at 58 (Work Background).  Plaintiff reports working here for about two or three months as a "meat hooker," where he would "put this machine inside . . . the cow's body and snatch . . . the bones out." Filing No. 12-1 at 47 (Transcript of Oral Hearing).  He claims he "couldn't catch onto [being a meat hooker] too well" and was moved to packaging.  *Id.*  Plaintiff states he performed this job for a couple of weeks before he was moved due to his tendency to "zone out" and "get [the boxes] backed up a little bit."  *Id.*  Plaintiff then moved to separating "a big box full

of meats" after being removed from packaging.  *Id.*  Plaintiff states he quit this job, but does not state why.  *Id.* at 47, 48.

After working at Greater Omaha Packing, plaintiff claims his next job involved selling cars.  *Id.* at 48.  This consisted of buying a car, making repairs (such as changing the battery or adding a stereo), and then selling the car.  *Id.*  Plaintiff states he repaired and sold three cars before his probation officer asked him to stop, apparently worried about the fact that plaintiff was not paying taxes on the money he received.[3]  *Id.* at 49.  Plaintiff then moved on to various side jobs, such as mowing grass and landscaping.  *Id.*  Plaintiff expressed interest in plowing snow in the winter months, stating he "want[s] to be able to have [his] own business."  *Id.* at 54.  Plaintiff also stated he would like to go back to work, but feared his lack of education was "going to kill" him. *Id.*  Plaintiff claimed, "I'm healthy as an ox. It's just, you know, my head ain't right. . . . I have stuff going on in my head that I don't think normal people actually have going on. I mean, I can click at any minute."  *Id.* at 55-56.  By "click," plaintiff clarified that "if something don't sit well with me . . . I'm basically a big ass kid."  *Id.* at 56.

A look at plaintiff's short medical history reveals complaints of auditory and visual hallucinations, anxiety, and depression.  Filing No. 12-6 at 96-7, 99, 101, 103. (Progress Notes).  Plaintiff also regularly demonstrated impaired judgment and impaired insight. *Id.* at 97, 99, 102, 104.  Plaintiff claims he is unable to consistently take his prescribed medications because of problems with medical insurance and expenses associated with

---

[3] His probation officer instead suggested selling the cars legitimately and starting a business. Filing No. 12-1 at 51 (Transcript of Oral Hearing).  Plaintiff then enrolled in two classes at Metro Community College to "work on his reading."  *Id.*  At the time of the ALJ hearing, plaintiff reported being enrolled for about three months, stating classes were going "rough."  *Id.*

the medications.  *Id.* at 107. He complains of "a lot of voices. . . . racing through [his] head," which "happens real bad when [plaintiff is] either stressed out or arguing."  Filing No. 12-1 at 56, 67.  (Transcript of Oral Hearing).  Plaintiff also complains of difficulty focusing, controlling his anger, and mood swings.  *Id.* at 67-69.  Plaintiff has not done any drugs since his release from prison.  *Id.* at 61.  It is also worth noting that plaintiff claims he "was scared to take medications while in prison," so he did not take any medications while in prison.  *Id.* at 65.

A consultative examination report from February 21, 2013, by Dr. Sean Stevens, PhD., revealed that plaintiff had a full-scale I.Q. of 51.  Filing No. 12-6 at 90 (Consultative Exam).  Dr. Stevens, a non-treating psychologist, interviewed plaintiff to help determine whether plaintiff qualified for disability.  *Id.* at 86.  Dr. Stevens opined that plaintiff's affect was flat, presenting as "irritable" and asking off-topic questions.  *Id.* Dr. Stevens also noticed plaintiff's "memory for past events is not always reliable" because of the brain injury plaintiff suffered at age fourteen.  *Id.*  Dr. Stevens cites plaintiff's mother as stating that plaintiff performed well in school up until this accident. *Id.* at 87.  Plaintiff also reported impulse control problems and severe temper problems stemming from the accident.  *Id.* at 88.  At this time, plaintiff also reported being hospitalized on one occasion "for being suicidal."  *Id.*

Dr. Stevens noted that during the interview "there was a sense of walking on eggshells; [a]s [plaintiff] could become irritated easily and was quite touchy."  *Id.*  Dr. Stevens found recurring episodes of deterioration when plaintiff is stressed in which plaintiff "can become verbally abusive and may hit a wall or throw things if angered."  *Id.* at 89.  Dr. Stevens found plaintiff to be in the "extremely low range for working memory,"

7

finding that plaintiff was unable to sustain the concentration and attention needed for task completion.  *Id.*  Dr. Stevens wrote that plaintiff tended to "space out" when given instructions due to plaintiff's inability to understand and remember short, simple instructions.  *Id.*  Dr. Stevens also wrote that plaintiff presents himself as being "put upon" and sees himself "as slighted by others."  *Id.* at 88, 89.

During this interview, plaintiff also took the Wechsler Adult Intelligence Scale-IV Edition (WAIS-IV) test.  *Id.* at 86.  While plaintiff took this test, Dr. Stevens noted specifically that plaintiff's "response latency was quite long for most questions . . . There would tend to be a pause to the point where it was unclear if [plaintiff] was paying attention or had heard the question, before [plaintiff] would respond."  *Id.* at 91.  Dr. Stevens found plaintiff's scores to be consistent with at least mild mental retardation, with his I.Q. score consistent with moderate mental retardation.  *Id.*  Dr. Stevens opined that "it seem[s] more likely that [plaintiff] is functioning in the mildly mentally retarded range," giving plaintiff a poor prognosis.  *Id.*

## II.   LEGAL STANDARD

In an appeal of the denial of Social Security disability benefits, this court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole'" and "may not reverse . . . merely because substantial evidence would support a contrary outcome."  *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 877 (8th Cir. 2002) (alteration in original).  Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion."  *Id.*  (quoting *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir.2010)).

8

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *See Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  The court may not reverse a decision supported by substantial evidence, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (citation omitted).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner's] action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (alteration in original) (citations omitted) (internal quotation marks omitted).  In determining whether substantial evidence in the record supports the decision, the court must consider evidence that both detracts from and bolsters the Commissioner's decision.  *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2000) (citations omitted).

The court must also determine whether the ALJ's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000) (citations omitted).  The court does not owe deference to the ALJ's legal conclusions.  *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the ALJ must perform a five-step sequential analysis described in

the Social Security Regulations.  20 C.F.R. §§ 404.1520(a), 416.920(a).  Specifically, the ALJ must determine:  "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy."  *Tilley v. Astrue*, 580 F.3d 675, 678 n.9 (8th Cir. 2009).  "Through step four of this analysis, the claimant has the burden of showing that she is disabled.  Only after the analysis reaches step five does the burden shift to the Commissioner to show that there are other jobs in the economy that a claimant can perform."  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008) (citations omitted).  If the ALJ finds that a claimant is disabled or not disabled at a step, the evaluation does not go on to the next step.  20 C.F.R. § 404.1520(a)(4).

In order to evaluate the claimant's impairments at steps four and five of the analysis, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).  A claimant's RFC represents what he or she can do despite his or her limitations.  20 C.F.R. § 404.1545.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial.").  A claimant's RFC is a medical question; therefore,

> [s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.  In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is

required to consider at least some supporting evidence from a professional. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citations omitted) (internal quotation marks omitted).

### III.   DISCUSSION

The ALJ denied plaintiff's claim primarily because plaintiff's mental impairments, considered singly and in combination, allegedly failed to meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 – specifically Listings 12.04 and 12.06.   Filing No. 12-1 at 16-17 (ALJ Hearing Decision). The ALJ followed the five-step analysis required under 20 C.F.R. §§ 404.1520(a), 416.920(a).

### A.   Listings for Intellectual Disability

#### 1. Law

Section 12.05 for Intellectual Disability defines an intellectual disability as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (2014).  The required level of severity to meet this Listing may be satisfied in one of four possible ways.  *Id.*  Under § 12.05(A), the Listing is met by "mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded."  *Id.*  Under § 12.05(B), the Listing is met by a "valid verbal, performance, or full scale IQ of 59 or less."  *Id.*  Under § 12.05(C), the Listing is met by a "valid verbal, performance, or full

11

scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.* Under § 12.05(D), the Listing may be met by a "valid verbal, performance, or full scale IQ of 60 through 70" that results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration." *Id.*

According to the Social Security Administration, the judgment of a physician or psychologist designated by the Commissioner on the issue of whether a claimant has impairments that equal a Listing must be received into the record as expert opinion evidence and given appropriate weight. SSR 96-6P, 1996 WL 374180 (July 2, 1996) at *3. Further, those opinions may be entitled to greater weight than the opinions of treating or examining sources. *Id.*; *Richardson v. Astrue*, 2011 WL 4479215 (E.D. Ark. Sept. 28, 2011). Additionally, the opinions of a treating physician may be discounted when they are inconsistent with the overall assessment of the physician or the opinions of other physicians, especially when those opinions are "supported by better or more thorough medical evidence." *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir. 2000) (citing *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997); *Merckling v. Astrue*, 2012 WL 13706 (E.D. Mo. Jan. 4, 2012).

## 2. *Section 12.05(C) Listing*

The court notes that the ALJ was correct in finding that plaintiff did not meet the requirements for § 12.04 or § 12.06 Listings. Filing No. 12-1 at 15-16 (ALJ Hearing Decision). However, the court finds that plaintiff meets the requirements for § 12.05(C)

12

Listing for intellectual disabilities.  In the opinion, the ALJ gave the most weight to Dr. Selvaraj's progress notes and the opinion of the Disability Determination Services ("DDS") in deciding plaintiff does not meet any Listings.  *Id.* at 16.  Yet, in reaching this conclusion, the ALJ does not provide reasons why Dr. Selvaraj and DDS are given more weight. In the decision, the ALJ notes that Dr. Stevens found plaintiff had "moderate difficulties" in social functioning and concentration.  *Id.*  The ALJ also quotes Dr. Stevens as finding plaintiff needed frequent redirection to task and asked tangential questions.  *Id.*  However, these facts are seemingly discredited, with little to no reason, by the ALJ in favor of the opinions of Dr. Selvaraj and the DDS.

Plaintiff argued both at the ALJ hearing and in earlier writings that he did in fact meet the requirements for § 12.05(C).  Filing No. 12-1 at 34 (Transcript of Hearing); Filing No. 12-5 at 96 (On the Record Request).  At the hearing, as plaintiff began to explain why a history of behavioral problems satisfied the requirements for § 12.05(C), the ALJ interrupted plaintiff to state, "12.05 doesn't pertain to behavior."  Filing No. 12-1 at 35 (Transcript of Hearing).  Plaintiff responded by saying, ". . . it certainly does. I have to disagree with you. . . . it's deficits in adaptive functioning . . . reflected by special education, behavioral deficits, poor behavior, acting out. . . . Those . . . are reflective of [behavioral problems required under § 12.05]."  *Id.*  Nowhere in the ALJ's decision is § 12.05(C) discussed.

Section 12.05(C) specifically provides that a full scale I.Q. of 60 through 70 paired with another physical or mental impairment that imposes additional, significant work-related limitation of function indicates a qualifying intellectual disability.  20 C.F.R. Pt. 404, Subpt. P, App. 1 (2014).  Plaintiff was first found to have an I.Q. score in this

13

range in 1993, when he was documented as having a full scale I.Q. of 69.  Filing No. 12-5 at 81 (School Records).  Then, in 2013, Dr. Stevens examined plaintiff at the request of DDS and found plaintiff had a full scale I.Q. of 51.  Filing No. 12-6 at 90 (Consultative Exam).  Under § 12.05(B), a full scale I.Q. of 59 or less is in and of itself sufficient to prove intellectual disability.  20 C.F.R. Pt. 404, Subpt. P, App. 1 (2014).  Either of these recorded full scale I.Q. scores should have led to a finding that plaintiff has a qualifying intellectual disability.  Therefore, the ALJ should have concluded her analysis at step three with a finding of plaintiff as disabled, and this Court so finds.

## IV.    CONCLUSION

For all of the reasons found above, this court finds that the determination of the ALJ to deny benefits is not supported by substantial evidence.  "[W]here the medical evidence in the record overwhelmingly supports a finding of disability, remand is unnecessary." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 954 (S.D. Ia. 2000) (citing *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987)).  The court determines that the record overwhelmingly supports a finding of disability.  Remand to take additional evidence in this case would only delay the receipt of benefits to which the plaintiff is entitled.

THEREFORE, IT IS ORDERED THAT the Commissioner is hereby reversed and benefits awarded to the claimant.  A separate judgment will be entered in accordance with this Memorandum and Order.

Dated this 6th day of October, 2016.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

14